## John A. M'Gaw *versus* The Ocean Insurance Company.

A ship laden with tobacco and cotton on freight, and bound from New Orleans to Havre, was injured by the perils of the seas and a part of her cargo damaged, and she returned to New Orleans for repairs. There was reason to believe that she could be refitted for sea in three or four months. The cargo could not be sent on in another vessel at a lower rate of freight, and the master delivered it up to the shipper. It was *held*, that the insurers on the freight were responsible for the loss of the freight on the portion of the cargo which was wholly destroyed, but that they were not responsible in respect to the sound portion, because the master was not bound to give it up without receiving full freight on it, but might have retained it, to be transported in his own vessel, nor in respect to a portion of the cotton which was sold by the master at New Orleans, in consequence of its being wet by sea-water, although cotton in that condition is liable to spontaneous ignition.

In adjusting a partial loss under a policy on the freight of a cargo of cotton and tobacco, the freight being valued at an entire sum, the valuation should be applied to the cotton and tobacco respectively in the proportion which the stipulated freight of each bears to the valuation of the whole freight, and the loss be estimated accordingly.

This was an action on a policy of insurance, whereby the defendants insured the sum of $ 10,000, on the freight of the ship Choctaw, valued at the same sum, at and from New Orleans to Havre, the ship being owned by the plaintiff and Freeman Foster, the master.

By an agreed statement of facts it appeared, that the Choctaw took on board at New Orleans a full cargo, consisting of 504 hogsheads of tobacco and 560 bales of cotton, to be transported to Havre, at the freight of fifty shillings sterling per hogshead of tobacco, and one and three eighths of a cent

per pound of cotton ; that the cotton weighed 251,008 pounds , that the ship sailed from New Orleans on the 16th of June, 1836, but got aground on the bar at the South West Pass of the Mississippi, and remained there leaking badly, till the 5th of July, when she was got off and brought up to New Orleans ; that a part of the cargo was taken out while she was on the bar, to lighten the vessel, and the residue was necessarily discharged after her arrival at New Orleans, in order to make the necessary repairs ; that 443 hogsheads of tobacco and 69 bales of cotton were so much damaged, in consequence of the leak, that they could not be sent forward on the voyage ; that the cargo was surveyed by the port wardens of New Orleans, and the damaged portion thereof ordered to be sold ; that the master, on being applied to by a firm of commission merchants, representing themselves to be the agents of the defendants, (though in fact they were not authorized to act for them,) allowed them to sell the damaged portion of the cargo ; and that a part of the proceeds was applied to the payment of the cargo's contributory share of the general average, and the residue was paid to the consignor at New Orleans.

On the 1st of August, 1836, the consignor of the cargo required the master of the Choctaw to send forward or deliver up the sound portion of the cargo forthwith, threatening, in case of his non-compliance, to take such legal steps as might be necessary to prevent any other disposition of the property ; and the master, believing that his vessel could not be repaired so as to carry forward the sound portion of the cargo in a reasonable time, yielded to the requisition, and the same was shipped for Havre, by the firm before mentioned, in another vessel, at one and a half cent per pound for the cotton, and sixty shillings sterling per hogshead, for the tobacco. The Choctaw could not have gone to sea with 491 bales of cotton and 61 hogsheads of tobacco, without 200 tons of ballast or other heavy freight equivalent thereto, to render her seaworthy.

Immediately after the return of the Choctaw to New Orleans, she was surveyed, and her injuries being found to be numerous and important, she was put into the hands of Harrod & Hughes, experienced shipwrights, to be repaired and made ready to receive her cargo on the 1st of November, 1836.

By the deposition of Hughes it appeared, that the tobacco was wet, and the principal part of it had actually decayed ; and that it was not in a condition to remain on board the ship, or to be shipped on board another vessel.

The freight was abandoned on information of the disaster, and preliminary proof of loss was offered on the 12th of July, 1836 ; and the defendants, by a letter of the same date, declined to accept the abandonment.  On the 18th the president of the office requested the plaintiff to write to the master and state to him, that he had a right to retain the cargo for his freight, and to desire him to do so; and the plaintiff immediately wrote to the master informing him what the president had stated.

Upon these facts and such just inferences as the Court might think warranted thereby, such judgment was to be rendered as the Court should deem the law to require.

*C. P. Curtis* and *B. R. Curtis*, for the plaintiff.  We contend, that there was a total loss of freight, in this case, occasioned in part by the damage sustained by the cargo, and in part by that sustained by the vessel.  1 Phil. on Ins. 290 ; *Whitney* v. *New York Firemen Ins. Co.* 18 Johns. R. 208 , In order to earn freight it is necessary that the goods should arrive at the port of destination in such a state as to be of some value.  *Frith* v. *Barker*, 2 Johns. R. 327.

The master, as between himself and the defendants, was not bound to carry forward the damaged portion of the cargo.  The damaged tobacco would have been deleterious to the health of those on board the vessel ; and the cotton being wet with sea-water, was liable to spontaneous ignition.  18 Johns. R. 208.

The sale of the damaged portion of the cargo at New Orleans, and the payment of the net proceeds to the consignor, did not vary the rights of the insured.  18 Johns. R. 208 ; *Callender* v. *Ins. Co. of North America*, 5 Binney, 525 ; *Hurtin* v. *Union Ins. Co.* 1 Washington, 530.

As to the damage done to the ship, it will be said, that it was the duty of the master to repair the vessel, and to retain and carry on the sound portion of the cargo.  There would have been a technical total loss even then, as that portion of the cargo which was damaged was to pay more than one half

of the freight.    18 Johns. R. 210 ;  *American Ins. Co.* **v.**
*Center*, 4 Wendell, 45.  The master is bound to repair the ves-
sel and carry on the cargo, in a *reasonable* time, if he can do so.
*Clark* v. *Mass. F. & M. Ins. Co.* 2 Pick. 104.  But he must de-
termine whether his vessel can be repaired in a reasonable time,
on the probabilities of the case, using his best  discretion.    In
the present case, the  master acted in good  faith and under the
advice of  others on  the spot.    If he was not the agent of  the
defendants, yet his acting  on  the emergency according to his
best judgment is of  great weight as respects all parties.    Un
der the circumstances of this case, the master was justified in
giving up the cargo to the owner.  1 Phil. on Ins. 191, 192 ;
*Mount* v. *Harrison*, 4 Bingh. 388 ;  *Saltus* v. *Ocean Ins. Co.*
12 Johns. R. 113.

*Choate* and *Crowninshield*, for the defendants.    The master
should have  retained the cargo, and after repairing the vessel,
have carried it to the port of  destination ; and this would have
entitled him to  full freight.    *Griswold*  v. *New York Ins. Co.*
1 Johns. R. 205 ; *S. C.* 3  Johns. R.  321 ;  1  Phil. on Ins.
373 ;  *Jones* v. *Ins. Co. of North America*, 4 Dallas, 246.

If the goods  arrive in *specie*, through a mass of  corruption,
freight is earned.    Pothier  des  Contr.  Mar. (Cushing's  ed.)
§ 59 ;  *Saltus*  v. *Ocean Ins. Co.* 14  Johns. R. 138 ;  Jacob-
sen, 270 ;  1  Phil. on Ins. 487, 488 ;  *Neilson* v. *Col. Ins.
Co.* 3 Caines's R. 108 ;  *Cocking*  v. *Frazer*, 1  Park on Ins.
181.    So, if the  damaged state  of the cargo makes it expe-
dient to sell it, the rule is uniform, that full freight to the port
of destination is earned.  The master then had a right to sell at
New Orleans and to hold on the proceeds for full freight.    1
Phil. on Ins. 373 ;  Benecke on Ins. 444 ;  Stevens on Av-
erage, (by Phillips,) 286, note ;  Stevens on Average, 80, 81 ;
*Baillie* v. *Moudigliani*, 1  Park on Ins. 52.

If, however, the master was right in giving up the cargo, he ·
was bound, after repairing his vessel, to have procured another
cargo, the freight of  which would have  enured as salvage.
*Green* v. *Royal Exch. Ass. Co.* 6 Taunt. 68 ; *Everth* v *Smith*,
2  Maule & Selw. 278 ;  *Coolidge* v. *Gloucester Ins. Co.* 15
Mass. R. 345.

SHAW C. J. delivered the opinion of the Court.  The prac-
tice of  making freight a distinct subject of  insurance, either by

M'Gaw
*v.*
Ocean
Ins. Co.

the same, or by different underwriters, is well established in England and in this country, though it is said not to prevail on the continent of Europe. The insurance of ship and freight, as separate and independent subjects of insurance, occasionally presents difficulties in the application of the principles of insurance law, and especially those respecting abandonment, which have not been wholly removed, either by stipulations in the contract, or by judicial decisions.

Several questions which frequently arise on policies of insurance on freight, do not arise in the present case. Points of difficulty often occur as to the actual inception of the risk on freight, whether the voyage has commenced, whether the cargo has been partly shipped, or whether there is a charter party, by which the ship-owner is entitled to a full freight, and has taken any measures towards the actual execution of the contract. In general terms it may be said, that the insurance on freight will attach when the ship-owner is in such a situation in regard to his vessel and voyage, that nothing but the intervention of one of the perils insured against, can prevent him from completing his voyage and earning his freight.

In order to earn freight, there must be a vessel to carry it, a cargo to be carried, either actually on board, or so engaged as to give the ship-owner a right to have it. Where the freight is insured on a particular voyage, by a particular vessel, and the cargo has been put on board, and the vessel actually sails in the prosecution of the voyage, it is the freight of that cargo, in that vessel, and on that voyage, which is the subject of insurance, and to which the policy attaches. Then if the vessel is lost by one of the perils insured against, the freight is lost by that peril. Or if the cargo is lost by one of the same perils, as if consumed by fire, or captured by an enemy, the owner loses the power of earning his freight by carrying that cargo, and the freight is lost by one of the perils insured against. There may be a freight, *pro ratâ itineris*, in case the vessel, after carrying the cargo a part of the distance, has done a beneficial part of the service, and the owner of the goods consents to receive his property at a place short of the destined port; or the master may engage another vessel to carry on the

cargo to the place of destination, and thus earn his full freight, at the expense of the hire of such other vessel. So in case of the loss of cargo, other goods may be taken in its stead, if they can be obtained, the freight of which may enure by way of salvage. In various ways, by the application of the equitable principles of maritime law, the loss may be relieved and mitigated ; but in strictness, if the ship be destroyed or prevented from prosecuting and completing the voyage thus commenced, by stranding, by hostile seizure, or by any of the perils insured against ; or, if the specific goods so laden are destroyed, so that they no longer exist and cannot be carried to the port of destination, the freight insured is lost. There would seem to be little difficulty in the application of these principles, when either the ship or cargo is actually destroyed and ceases to exist.

In case of the actual total loss of vessel, the freight is, of course, lost ; and it seems now as well settled, that upon a constructive total loss, which may be made actual by an abandonment, there is also a loss of freight. *Coolidge v. Gloucester Ins. Co.* 15 Mass. R. 341. But the principal difficulty arises, when there is damage to the vessel, not amounting to a total loss, but causing a detention of the vessel, and a retardation of the voyage, and damage to the cargo, not amounting to an actual loss or destruction of the goods. It is upon the rules applicable to such a case, that the decision of the present question must depend.

In the present case it has not been contended that the loss of freight has been occasioned by the total loss of the vessel, actual or constructive ; and although the cost of repair was large, no attempt has been made to show, that it amounted to half the value of the vessel, after making the usual deductions, so as to amount to a constructive total loss, as in *Coolidge v. Gloucester Ins. Co.*

The first question therefore seems to be, whether the master was bound to give up the cargo, on the demand of the shipper, by which he was wholly deprived of earning the freight insured, by carrying that cargo.

When the goods are shipped and the voyage is commenced, the right of the ship-owner to full freight has attached ; and in

case of accident and detention, either by putting back to the port of departure, or by stopping at an intermediate port, more or less distant from the port of destination, the shipper has no right, without the consent of the ship-owner, to demand and obtain the goods, without paying full freight, in case the ship-owner, or the master in his behalf, can either refit his own ship within a reasonable time, and proceeds to do so, or within a like reasonable time, will transmit the goods in another vessel If a beneficial part of the voyage has been performed, when the voyage has been so interrupted, and the goods can be transported the remainder of the way at a cost less than the original freight, and the shipper consents there to receive his goods, and the ship-owner to deliver them, the law raises a promise to pay freight *pro ratâ itineris*, for the part of the voyage thus performed.  The original contract is not executed, and the stipulated freight is not earned ; bu by the consent of both parties the original contract is relinquished, and then from the beneficial service performed by the one party for the benefit of the other, the law raises a promise, upon equitable considerations, to pay a part of the stipulated freight, in the proportion that the service actually done, bears to that undertaken to be done.  This, we think, is the true principle, upon which the case of *Luke* v. *Lyde*, 2 Burr. 882, was decided, modified and adopted, as it has been, by more recent cases. *Coffin* v. *Storer*, 5 Mass. R. 252.

In case the vessel puts back to the port of departure, freights remaining as high as when the shipment was made, or if the detention be at a place from which to the port of destination, freights are as high as the freight stipulated to be paid, then no benefit has been conferred on the shipper, no equitable obligation arises to pay a freight *pro ratâ itineris ;* and if the shipper consents to take back his goods, and the ship-owner to surrender them, no freight is earned.  But if the ship-owner was not obliged by law so to surrender them, then the freight is lost, not necessarily by the perils insured against, but by mutually rescinding the contract, by which it would have been earned. In the present case, it appears, that the goods were brought back to the port, from which they were shipped, and it is found that they could not be shipped at a lower rate, than that stipu-

lated for in the Choctaw ; and it follows, that there could be no gain to the ship-owner by sending them on in another vessel ; and, of course, no salvage could be made on the freight. And, for the same reason it is manifest, that the ship-owner could obtain no freight *pro ratâ itineris*, because no substantial or beneficial part of the transportation of the goods had been accomplished. Was the master then bound to deliver up the cargo, and relinquish the voyage ?

It is now well settled, by a series of cases, that if a vessel is damaged by one of the perils insured against, and in consequence thereof is obliged to put back or seek a port of refuge, and unlade and repair, the master, if he can refit his ship and proceed in a reasonable time, may retain the cargo and carry it to its place of destination, and will then earn his full freight. If, therefore, he voluntarily relinquishes the right to do so, by giving up the cargo to the shippers, he loses the right of earning the freight on that particular cargo, by such voluntary act, and not by one of the perils insured against, and therefore the underwriters on freight are not answerable. *Clark* v. *Mass. F. & M. Ins. Co.* 2 Pick. 104. And it makes no difference in this respect, that by such detention and retardation of the voyage, the arrival of the cargo at the place of destination will be so late as to disappoint the purposes of the shippers, by the change of the season, loss of market, or otherwise. It is not within the scope of the insurer's contract, that the vessel or cargo shall arrive at any particular time, but only that the vessel shall not be prevented from proceeding to the port of destination and carrying the cargo, by any of the perils insured against.

Nor does it make any difference if the cargo is damaged, and unfit to be shipped, if it remains *in specie*, and can be carried to the port of destination ; as the ship-owner is not responsible for the damaged condition of the goods, whether such damage arise from a principle of internal decay, or from perils of the sea. In such cases, it is held, that as between the shipper and ship-owner, the latter is entitled to his freight, although the goods have become utterly worthless, and that he has his remedy for his freight, not only by a lien upon the goods, (which, in the case supposed, would avail him nothing,)

but also by an action against the shipper, on his contract for the carriage. *Griswold* v. *New York Ins. Co.* 1 Johns. R. 205 ; *S. C.* 3 Johns. R. 321 ; *Herbert* v. *Hallett*, 3 Johns. Cas. 93 ; *Whitney* v. *New York Firemen Ins. Co.* 18 Johns. R. 208.

In the case first above cited, it was held, after great consideration, that where a vessel sailed with a cargo of flour, and grounded almost within sight of the port of departure, by means of which the cargo was so damaged, that it would have been worth nothing, if carried to the port of destination ; yet inasmuch as by carrying it the ship-owner might have earned his freight, it was manifest, that the freight in that specific cargo was lost by the voluntary surrender of it to the shippers, and not by one of the perils insured against, and consequently the underwriters on freight were not liable.

So, if from prudential considerations a master lands part of his cargo, which has been wet by salt water, by a leak occasioned by one of the perils insured against, and leaves the property (cotton), because there would be danger of ignition, if replaced on board the vessel without washing it in fresh water and drying it, and sails without it, the underwriter on fieight is not responsible, although the master acted for the best under the circumstances. *Mordy* v. *Jones*, 4 Barn. & Cressw. 366. The true reason of the decision seems to have been, that though it might be more prudent for the master to leave the cotton and lose the benefit of the freight to be earned by carrying it, than to expose the ship and remaining part of the cargo to great hazard, by taking it in, or delaying the voyage a long time for the purpose of washing and drying it, still such loss of his freight resulted from this prudent choice of expedients, and was not directly caused by any one of the perils insured against.

Whether the vessel can be repaired and made ready to take the cargo, within a reasonable time, is a question which must depend much upon the circumstances of the case, such as the place where the vessel is, or can readily be brought to, whether labor and materials can be readily had or promptly obtained ; and this must be determined by considerations applicable to the vessel alone, and will not be influenced by the consideration,

35 *

that the cargo will be deteriorated by the delay, or lose the proper season for a favorable market, or for a particular sale which the shippers have in contemplation. *Clark* v. *Mass. F. & M. Ins. Co.* 2 Pick. 104. Under the circumstances found in this case, the vessel being at New Orleans, a port where every species of labor and materials can be had for *re-fitting* and *repairing* vessels, and where the master immediate-ly proceeded to have his vessel repaired with all convenient speed, and where there was reason to believe, that these re-pairs could be completed and the vessel despatched in three or four months, the Court are of opinion, that this was a reasonable time, and that the master was under no legal obligation to give up the cargo to the shippers, without receiving his full freight thereon.

In stating this opinion, however, we would not be under-stood to intimate that it at all follows, as a necessary conse-quence, that the master did wrong, or acted injudiciously, in regard to the interest of the owners, of whom I believe he was one. He must adopt one of three courses, viz. either, 1. surrender the cargo to the shippers, upon their request, and thus put an end to the enterprise ; or, 2. retain the sound part of the cargo and forward it by another vessel, and there-upon receive the full freight due upon it ; or, 3. retain it till his own ship should be ready, and then carry it forward to the port of destination, and receive the full freight due upon it.

No part of the freight had been actually or beneficially earned. The cargo was necessarily brought back to the place of shipment and relanded, and the vessel put into the hands of the shipwrights.

The master could save nothing by transporting the property in another ship, because the freight was higher than that which he was to receive. It would have been a loss and not a gain to the owners. He could not, therefore, with any advantage, adopt the second expedient.

What then would have been the result of retaining the cargo until his own ship was ready and then taking it forward ?

It seems to be well settled, that when a cargo is put on board of a general ship, or even of a chartered ship, where the owners are at the whole expense of the navigation, that is,

where freight is to be paid as a compensation, not for the use of the ship, but for the transportation of the goods, and especially where freight is payable at a certain sum, upon the bale, hogshead, or package, freight is due upon that part which arrives and is delivered, or ready to be delivered, and not upon that part which has been lost by the perils of the sea. Abbott on Shipping, 301 ; *Frith* v. *Barker*, 2 Johns. R. 337.

In the latter case, it was held, that where the contents of packages were wholly destroyed by one of the perils insured against, as where sugar had been wholly dissolved and lost by sea-water, occasioned by springing a leak, no freight was due for it, though the empty casks remained.

And it appears equally well settled, that if the goods arrive at the place of destination, although in a damaged condition, full freight is payable upon them, which is secured to the ship-owner as well by a lien on the goods as by the personal obligation of the shipper. Abbott on Shipping, 292 ; *Griswold* v. *New York Ins. Co.* 1 Johns. R. 205 ; *S. C.* 3 Johns. R. 321.

In the present case, freight was payable for the transportation of the goods, at a fixed rate by the hogshead and bale ; and therefore the master would have been entitled to his full freight in proportion to the number of bales and hogsheads carried and ready to be delivered, and no more, including as well the damaged as the sound, if they specifically remained, but not including those which had been wholly destroyed and lost by the perils insured against.

From this view of the rights of the ship-owner, it is manifest, that if the master had retained the cargo, taken in all that part of it which had not been lost, and proceeded to Havre, he would have been entitled to full freight, upon the number of hogsheads and bales thus carried, and no more. For the balance of his freight, being that lost by the perils insured against, the owner must have looked to the underwriters on freight, unless indeed he could have obtained other freight, in the place of that lost, which would have operated, *pro tanto*, as a salvage upon freight. This, however, must have been uncertain and precarious. But in order to have obtained that freight, he must have taken in this cargo, commenced the voyage anew, and prosecuted it to its termination, at the same expense as that at which

a new cargo could be taken in and transported. If, therefore, the freight which he was to receive for the cotton and tobacco, was taken at a fair average rate, and if as favorable a freight could be obtained anew, after his vessel was ready, from other shippers, then the master lost nothing by giving up this partially damaged cargo. As far as the facts go, they show that freights were rising, because larger prices were paid for the freight of the same cotton and tobacco in other vessels, than were stipulated to be paid to the owners of this vessel.

Under these circumstances, it might be the wisest and most judicious course, and most beneficial to the owners, for the master to give up the cargo thus partially lost and damaged, and not attempt to earn a freight upon the transportation of these particular goods, at the cost which it would have required ; when his vessel could be employed as beneficially, or more so, elsewhere, as soon as she could be put in a condition to be employed at all. He might even have an offer for a better freight elsewhere, when this cargo was delivered up. But it follows, as a necessary consequence, that if the voyage, on which freight was insured by the defendants, was relinquished upon prudential considerations, when it might have been prosecuted and the freight earned, the loss of the particular freight thus insured, was caused by the voluntary act of the assured and their agents, and not by any of the perils insured against.

The result we think is, that as the vessel could have been repaired in a reasonable time, and that part of the cargo which specifically remained could have been taken in and carried, and the freight received upon it, the plaintiffs are not entitled to recover ; but for that part which had been wholly lost and destroyed, the plaintiffs are entitled to recover. The whole of the cotton might have been reshipped ; for though wet and damaged, it remained in specie, and might have been carried. Of that part of the tobacco which was wholly destroyed and lost, by the damage sustained by the vessel in grounding on the bar, the freight must be deemed lost, by one of the perils insured against.

A question occurred as to the effect of the valuation in this case. We understand, from the facts stated, that the tobacco and cotton constituted a full cargo for the vessel, so that all the

freight intended to be put at risk and covered by the policy, was put at risk, when the policy attached. Then the policy, which perhaps was originally intended to attach to any freight which might be taken in the vessel from New Orleans to Havre, in fact, attached to the cargo of cotton and tobacco, and the valuation applied accordingly, to those specific articles. It is not, therefore, the case of a valued policy, where the whole subject contemplated to be embraced in the valuation is not put at risk, and where the policy must necessarily be opened in adjusting a loss. *Fobes* v. *Aspinall*, 13 East, 323 ; *Wolcott* v. *Eagle Ins. Co.* 4 Pick. 429 ; *Haven* v. *Gray*, 12 Mass. R. 71. But here the valuation comes so nearly to the actual freight which would have been earned, that whether adjusted as an open or valued policy makes little difference. Considering the sterling money in which the freight of the tobacco was to be paid, at the old par of $ 4·44 to the pound, it would amount to $ 5600, which, with that of the cotton, amounting to $ 3451·36, would make $ 9051·36. But adding exchange, commission, and premium, which is covered by the policy, the actual freight will amount to just about the sum at which it is valued. But if, upon computation, there should be found to be any difference, we think the valuation should be applied to the cotton and tobacco respectively, in the proportion which the stipulated freight of each bears to the valuation of the whole freight, and the loss of freight on that portion of the tobacco which perished, must be estimated accordingly.

By consent of the parties, the cause may be referred to assessors, to examine and report the amount due, on these principles.